**K.D.F., a Kansas General Partnership, Kansas Public Employees Retirement System, and Pacholder Associates, Inc., Relators,**

v.

**The Honorable James L. REX, Judge, Respondent.**

No. D–4340.

Supreme Court of Texas.

Argued Dec. 16, 1993.

Decided June 22, 1994.

---

Randall L. Rouse and Joel B. Locke, Odessa, Kevin B. Jackson, Andrews, for relators.

Homer Gilbe Hollingsworth, Midland, Daniel D. Sullivan, Andrews, Greg Jordan, Robert L. Brown, III and Donald R. Taylor, Austin, for respondent.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, HIGHTOWER, HECHT, GAMMAGE, ENOCH and SPECTOR, Justices, join.

In this mandamus action, the Kansas Public Employees' Retirement System

("KPERS"), a Kansas governmental entity, and two affiliated entities, K.D.F. and Pacholder Associates, contend that the trial court abused its discretion by overruling their TEX.R.CIV.P. 120a special appearances. All three assert that under principles of interstate comity, Texas is obliged to recognize the sovereign immunity of the State of Kansas and therefore to decline to exercise jurisdiction over them. *See generally United Mexican States v. Ashley,* 556 S.W.2d 784 (Tex.1977) (recognizing foreign sovereign under international principles of comity). We determine that two of the three relators are conditionally entitled to issuance of the writ.

## I

KPERS is a Kansas governmental entity. KAN.STAT.ANN. § 74–4903 (1992). Kansas Debt Fund ("K.D.F.") is a Kansas General Partnership, created by Commerce Bank of Topeka, Kansas, which holds securities on behalf of KPERS. Pacholder Associates, Inc., KPERS's independent investment advisor, is an Ohio corporation with its principal place of business in Ohio. The Real Parties in Interest are plaintiff Texas Hydrogen Energy Corporation, a Texas corporation wholly owned as a subsidiary, and its parent, plaintiff Hydrogen Energy Corporation, a Utah corporation based in Kansas. (collectively, "Hydrogen").

This controversy arises out of a loan KPERS made to Hydrogen in November 1989, in return for which Hydrogen executed a promissory note ("Note K") payable to K.D.F. as KPERS's agent. The purpose of the loan was to facilitate Hydrogen's purchase of an oil and gas property in Andrews County, Texas, from a debtor in bankruptcy; Hydrogen used the loan proceeds to purchase another promissory note ("Note H") from a creditor in the bankruptcy proceedings. A mortgage on the Andrews County oil and gas property secures Note H, and KPERS has secured Note K by taking a security interest in Note H and the mortgage securing it. *See* TEX.BUS. & COM.CODE ANN. §§ 1.201(37), 9.103 & cmt. 4, 9.201 (Vernon 1991 & Supp.1994). From an earlier transaction between the parties, K.D.F. holds a $2,500,000 convertible debenture dated April 2, 1985.

In 1991, Hydrogen sought to sell the Andrews County property to UMC Petroleum Corporation. The sale fell through, Hydrogen claims, after KPERS and K.D.F. reneged on their agreement to release K.D.F.'s security interest in Note H. Hydrogen also alleges that KPERS and K.D.F. impermissibly conditioned the release upon Hydrogen's payment of past due interest on the debenture.

Hydrogen filed suit against KPERS, K.D.F., and Pacholder in Andrews County on December 1991, alleging in its jurisdictional statement that the case involved the rights of creditors to mineral interests in Andrews County. Hydrogen sought damages and injunctive relief, alleging ordinary and gross negligence, tortious interference with business relations, fraud, defamation, breach of the duty of good faith and fair dealing, and breach of fiduciary duties. Hydrogen later amended its petition to add a claim for usury.

In response, each defendant filed a special appearance. After a hearing, the trial court overruled all objections to jurisdiction. The defendants, as relators, now seek mandamus relief from the trial court's order overruling their contest to jurisdiction.

## II

■ Initially, we address the parties' conflicting characterizations of the nature of Hydrogen's suit and the basis upon which the trial court has assumed jurisdiction over relators. Hydrogen argues that the trial court has exercised its *in rem* jurisdiction and that the issue presented is the right of Texans to sue in Texas courts to establish title to their land. Relators argue that Hydrogen's suit is one for damages brought "under the guise of a suit to determine the collateral interest of K.D.F. and to restrain a foreclosure." Hydrogen has sued for fraud, defamation and other torts, for injunctive relief, and for a declaratory judgment determining the effect of contracts between it and the Kansas entities, including the debenture, Note K, and the Note K security agreement. Hydrogen has not brought an action in trespass to try title, *see* TEX.PROP.CODE ANN. §§ 22.001–22.-

045 (Vernon 1984), or an action to quiet title. *See* Tex.Civ.Prac. & Rem.Code Ann. § 15.011 (Vernon 1986); *Humble Oil & Refining Co. v. Sun Oil Co.,* 191 F.2d 705, 710–11, 171–20 (5th Cir.1951), *cert. denied,* 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952). Hydrogen cannot obtain the relief it seeks unless our courts exercise *in personam* jurisdiction over KPERS and the entities associated with it. Thus, we conclude, this action cannot proceed *in rem. See McElreath v. McElreath,* 162 Tex. 190, 345 S.W.2d 722, 725–27 (Tex.1961) (distinguishing between *in rem* and *in personam* actions for purposes of interstate comity).

Furthermore, Hydrogen is the only party holding any interest in the realty located in Andrews County. The only interest that KPERS and K.D.F. hold is a security interest in "[Hydrogen's] notes, instruments, general intangibles, deeds of trust, guaranties, financing statements, mortgages, security agreements . . . and all extensions thereof." The Note K collateral includes Note H and any mortgage securing it, but the Andrews County property is not itself collateral for Note K.

Hydrogen's lien is not governed by Article Nine of the Uniform Commercial Code because the collateral securing Note H is real property. Tex.Bus & Com.Code Ann. § 9.104(10). KPERS's Note K lien, however, is an Article Nine security interest because, under Tex.Bus. & Com.Code Ann. § 9.102(c), "the application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply." The relevant KPERS security interest for present purposes is a security interest in an instrument, *see* Tex.Bus. & Com.Code Ann. §§ 3.104, 9.105(a)(9), 9.106, not real property. *See* Tex.Bus. & Com.Code Ann. § 9.102(c) & cmt. 4. The Note K security interest and the

remedies it affords[1] enable KPERS and K.D.F, in the event of foreclosure, to acquire Note H and the associated mortgage interest in Andrews County realty.[2] But Hydrogen is the only party that currently holds a real property interest.

### III

KPERS is a Kansas statutory entity, a "body corporate and instrumentality" of the Kansas government, Kan.Stat.Ann. § 74–4903 (1992), created to manage and invest the retirement savings of Kansas state employees. Analogous Texas entities are the Employees Retirement System of Texas, *see* Tex.Gov't Code Ann. §§ 811.001–815.501 (Vernon 1994), and the Teacher Retirement System of Texas. *See* Tex.Gov't Code Ann. §§ 821.001–825.511 (Vernon 1994). When Kansas created its public employee retirement system, it conditionally waived its sovereign immunity to lawsuits, but required all actions "directly or indirectly" against the system to be filed in Shawnee County, Kansas. Kan.Stat.Ann. § 74–4904 (1992 & Supp. 1993).

### A

Mandamus issues to correct a clear abuse of discretion when there is no adequate remedy by appeal. *Walker v. Packer,* 827 S.W.2d 833, 839–42 (Tex.1992). Recently, in *Canadian Helicopters v. Wittig,* 876 S.W.2d 304 (Tex.1994), we held that a defendant whose special appearance is overruled ordinarily has an adequate remedy by appeal, and is therefore not entitled to mandamus relief. Mandamus, we reiterated, is "an extraordinary remedy, available only in limited circumstances." *Id.* at 305 (citing *Walker,* 827 S.W.2d at 840). However, in *Canadian Helicopters,* we noted an exception to the rule when issues of sovereign immunity and comity are at stake:

> tion and priority are beyond the scope of this opinion. *See generally* James J. White & Robert S. Summers, 2 Uniform Commercial Code § 23–7 (3d ed., practitioner's ed. 1988 & Supp.1993); *In re Kennedy Mortgage Co.,* 17 B.R. 957 (Bankr.D.N.J. 1982); *Federal Deposit Ins. Corp. v. Forte,* 94 A.D.2d 59, 463 N.Y.S.2d 844, 849 (N.Y.1983).

1. Article Nine remedies permit KPERS to foreclose on Note H "when [the] debtor is in default," subject to the debtor's right of redemption. *See* Tex.Bus. & Com.Code Ann. §§ 9.501(a), 9.505(a), 9.506.

2. The Note K security interest may also affect Hydrogen's ability to assign or extinguish the Note H mortgage interest, and issues of perfec-

CHL points out our decision in *United Mexican States v. Ashley*, 556 S.W.2d 784 (Tex.1977), as support for its claim that mandamus review of a special appearance is appropriate. However, *Ashley* involved the issue of sovereign immunity, implicating comity and foreign affairs concerns not present in the usual special appearance. *Canadian Helicopters*, 876 S.W.2d at 306.

This comity exception, enunciated in *Ashley* and confirmed in *Canadian Helicopters*, is explained by the risk of harm to interstate and international relations likely to occur if a Texas trial court erroneously exercises jurisdiction over another sovereign. Such potential harm plainly goes beyond the additional time and expense ordinarily required to pursue an appeal, and beyond the immediate interests of the parties to the suit. Therefore, we reaffirm that an appeal does not provide an adequate remedy in this context.

■ The "clear abuse of discretion" standard is a function of the distribution of decision-making authority among the trial and appellate courts. As we said in *Walker*, "with respect to resolution of factual issues *or matters committed to the trial court's discretion*, for example, the reviewing court may not substitute its judgment for that of the trial court ... [o]n the other hand, review of the trial court's determination of the legal principles controlling its ruling is much less deferential." *Walker*, 827 S.W.2d at 839–40 (emphasis added). The decision whether to subject another sovereign to the jurisdiction of the Texas courts is not analogous to a discovery dispute or the resolution of an issue of fact. Because of the larger concerns at issue in cases such as *Ashley*, this court will not defer to the trial court on matters involving relations between Texas and other sovereigns.

**B**

Whether to recognize Kansas's sovereign immunity in this case presents an issue of interstate comity, unrelated to the Full Faith and Credit Clause. In *Nevada v. Hall*, 440 U.S. 410, 421–25, 99 S.Ct. 1182, 1188–91, 59 L.Ed.2d 416 (1979), the Supreme Court held that the Full Faith and Credit Clause of the United States Constitution, U.S. CONST. art.

IV, § 1, does not require a state to apply foreign statutes that conditionally waive sovereign immunity, particularly when the foreign statute would produce a result "in violation of [the forum state's] own legitimate public policy." *Id.* at 421–23, 99 S.Ct. at 1188–90 (citing *Bradford Elec. Light Co. v. Clapper*, 286 U.S. 145, 154–62, 52 S.Ct. 571, 573–77, 76 L.Ed. 1026 (1932); *Pacific Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493, 502–03, 59 S.Ct. 629, 633–34, 83 L.Ed. 940 (1938)). While the Court recognized the Constitution "places ... specific limitation[s] on the sovereignty of the several States," and the United States is therefore "not a union of 50 wholly independent sovereigns," the Court nevertheless declined to limit California's sovereignty by constitutionally requiring California to recognize Nevada's sovereign immunity. The Court concluded that recognized constitutional limitations on the independent sovereignty of the states "do not imply that any one State's immunity from suit in the courts of another State is anything other than a matter of comity." *Id.* at 425, 99 S.Ct. at 1190. Recognizing that interstate comity is a principle worth promoting, the court declared:

> It may be wise policy, as a matter of harmonious interstate relations, for states to accord each other immunity or to respect any established limits on liability. They are free to do so.

*Id.* at 426, 99 S.Ct. at 1191.

**C**

■ Comity is a doctrine grounded in cooperation and mutuality. United States courts defer to the sovereignty of foreign nations according to principles of international comity. *See Saudi Arabia v. Nelson*, —— U.S. ——, —— – ——, 113 S.Ct. 1471, 1476–79, 123 L.Ed.2d 47 (1993); *Republic of Argentina v. Weltover, Inc.*, —— U.S. ——, —— – ——, 112 S.Ct. 2160, 2164–65, 119 L.Ed.2d 394 (1992); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983); *United Mexican States v. Ashley*, 556 S.W.2d 784, 785–86 (Tex.1977). Likewise, under this "principle of mutual convenience," Texas will recognize the laws and judicial

decisions of other states, expecting that those states will extend Texas the same consideration. *Gannon v. Payne,* 706 S.W.2d 304, 306 (Tex.1986) (quoting *New Process Steel Corp. v. Steel Corp. of Tex.,* 638 S.W.2d 522, 524 (Tex.App.—Houston [1st Dist.] 1982, no writ)).

Arguing that Texas should not extend comity in this case, Hydrogen directs our attention to two cases in which other states have declined to extend comity to Texas. In the first of these cases, *Peterson v. Texas,* 635 P.2d 241 (Colo.Ct.App.1981), Floyd Peterson alleged that two youths under the supervision of a Texas Youth Counsel juvenile rehabilitation program in Colorado stole his car. The Texas Attorney General challenged the jurisdiction of the Colorado court, and the trial court dismissed the case, reasoning that Texas should be accorded the same sovereign immunity as Colorado reserved to itself under the Colorado Governmental Immunity Act. Colo.Rev.Stat. §§ 24–10–101 to 24–10–120 (1988 & Supp.1994). The Colorado Court of Appeals reversed, holding:

> [W]here the injured party is a citizen of this state, injured in this state and sues in the courts of this state, there is no immunity, by law or as a matter of comity, covering a sister state [sic] activities in this state.

*Id.* at 243. The appellate court did not, however, expressly consider whether Colorado should assess Texas's liability, if any, under the Texas Tort Claims Act. Tex.Civ. Prac. & Rem.Code Ann. §§ 101.001–101.109 (Vernon 1986 & Supp.1994). Nor did the Colorado court consider the effect of a mandatory venue statute.

In *Ehrlich–Bober & Co. v. University of Houston,* 49 N.Y.2d 574, 427 N.Y.S.2d 604, 404 N.E.2d 726 (1980), the New York Court of Appeals refused to recognize the sovereign immunity of a Texas governmental entity and to apply a mandatory venue statute similar to the statue upon which KPERS relies. Under Tex.Educ.Code Ann. § 111.33, venue is proper for suits against the University of Houston only in Harris County or Travis County, Texas. Nevertheless, the New York court declined to recognize the sovereignty of Texas because a venue statute enacted "to serve the administrative convenience of the State [of Texas]," *Ehrlich–Bober,* 427 N.Y.S.2d at 608, 404 N.E.2d at 730, in the eyes of that court, violated New York public policy.[3]

■ We reject Hydrogen's argument that, in deciding whether to recognize Kansas sovereignty, we should consider whether some jurisdiction other than Kansas has exercised jurisdiction over the State of Texas in a manner that violates recognized principles of interstate cooperation and mutuality. The issue here is whether *Kansas* has extended comity and recognized the sovereignty of Texas and other states. *See generally Head v. Platte County, Missouri,* 242 Kan. 442, 749 P.2d 6, 10 (1988) (holding that Kansas will not extend comity if "the effect would be deleterious to the public policy of [Kansas]"). Because comity is grounded in cooperation and mutuality, Texas should not extend comity to another state so long as that state declines to extend comity to Texas or other states under the same or similar circumstances.[4]

---

**3.** Although New York had similar statutes restricting the venue for lawsuits against its public universities, *see Ehrlich–Bober,* 427 N.Y.S.2d at 610–12, 404 N.E.2d at 732–33 (Jones, J., dissenting), the New York court decided that the policies advanced under both New York and Texas law were outweighed by other "public policy" considerations:

> Arrayed against that policy which essentially serves administrative convenience, is New York's recognized interest in maintaining and fostering its undisputed status as the pre-eminent commercial and financial nerve center of the Nation and the world.... Indeed, access to a convenient forum which dispassionately administers a known, stable, and commercially

sophisticated body of law may be considered as much an attraction to conducting business in New York as its unique financial and communications resources.

*Id.* at 608, 404 N.E.2d at 730. We suppose that the courts of New York, applying this rationale, would not necessarily consider it appropriate for any state other than New York to exercise jurisdiction over another sovereign in a commercial dispute.

**4.** *See generally* Robert Axelrod, The Evolution Of Cooperation 169–91, 176, 186–90 (1984) (concluding that proportional response is superior to escalation as a strategy to promote cooperation when a relationship is expected to be ongoing).

## IV

### A

■ In the absence of a clear indication to the contrary, we will treat Kansas as a cooperative jurisdiction. Texas will extend comity to the law of a cooperative jurisdiction so long as that law does not violate Texas public policy. *Robertson v. Estate of McKnight*, 609 S.W.2d 534, 537 (Tex.1980); *McElreath*, 345 S.W.2d at 724.

The Kansas mandatory venue statute does not violate any Texas public policy. Indeed, Texas has similar statutes that serve the same purpose the Kansas statute advances— minimizing the litigation costs that taxpayers must bear by providing state agencies with a convenient venue in which to litigate.[5]

Hydrogen argues that Texas public policy would suffer if a Kansas court were to determine the effect of the Note K security interest. Assuming that choice of law principles would require Kansas to apply the same law as Texas to this transaction, Hydrogen cannot claim prejudice solely on the ground that a different court will apply the same law. Moreover, Kansas, like Texas, has adopted the Uniform Commercial Code. *See* KAN. STAT.ANN. §§ 84–1–101 to 84–10–102 (1983 & Supp.1993). To the extent the UCC governs, the legal standards will be as familiar there as they are here.

Nor is the fact that Hydrogen may find litigation in Kansas less convenient or more expensive sufficient to offset Texas's interest in promoting interstate comity. The burden imposed on Hydrogen is little different from the burden our own legislature has placed on Texas citizens; mandatory venue statutes require our own citizens, even those who live as far away as El Paso, Beaumont, Brownsville, or Dalhart, to pursue certain claims against state governmental entities in Travis County.

Moreover, the only Texas plaintiff in this case is Texas Hydrogen Energy Corporation, which is a subsidiary of Hydrogen Energy Corporation. Hydrogen Energy Corporation, which is also a plaintiff, has its headquarters in Kansas. Under these circumstances, a Kansas venue appears to be as convenient as one in Texas.

### B

Hydrogen further argues that comity is not appropriate in this case because KPERS is engaged in commercial rather than governmental activity. We disagree. Initially, it is not clear to us that investing the retirement savings of state employees can be categorized as purely, or even primarily, a commercial activity. Kansas is not, for example, operating a mutual fund in which the general public may invest. Rather, KPERS exists to permit the Kansas government to fulfill its governmental function as a public employer.

Hydrogen cites *21 Turtle Creek Square, Ltd. v. New York State Teachers' Retirement Sys.*, 425 F.2d 1366 (5th Cir.1970), *modified*, 432 F.2d 64, *cert. denied*, 401 U.S. 955, 91 S.Ct. 975, 28 L.Ed.2d 239 (1971), for the proposition that a state agency's investment of funds in a particular property constitutes "doing business" for purposes of the Texas long-arm statute, thereby justifying Texas's exercise of jurisdiction. However, in *21 Turtle Creek Square*, the New York Teachers' Retirement System did not raise any issue concerning sovereign immunity. *See id.* at 1368. Nor do we need to decide whether KPERS has "done business" in Texas in a manner that would satisfy the Texas long-arm statute. *See id.* Identification of minimum jurisdictional contacts under the long-arm statute does not determine whether Tex-

---

5. *See, e.g.,* TEX.GOV'T CODE ANN. §§ 403.201, 403.-276(e), 466.101(d), 802.003(b), 841.005, 851.005, 2001.176(b)(1) (Vernon 1990 & Supp.1994); TEX. EDUC.CODE ANN. §§ 11.03(f), 11.061(f), 11.13(c), 12.33(b), 65.42, 67.26, 76.04, 106.38, 111.33, 135.55 (Vernon 1991 & Supp.1994); TEX. ALCO.BEV.CODE ANN. § 5.17 (Vernon 1978); TEX. BUS. & COM.CODE ANN. § 16.24 (Vernon 1987); TEX.CIV.PRAC. & REM.CODE ANN. §§ 15.014–15.016 (Vernon 1986); TEX.HEALTH & SAFETY CODE ANN.

§§ 361.321(a), (b), 382.032(a), 402.029(a) (Vernon 1992 & Supp.1994); TEX.NAT.RES.CODE ANN. §§ 33.171(a), 33.172–33.173, 40.257, 51.303, 52.-099 (Vernon 1978 & Supp.1994); TEX.PROP.CODE ANN. §§ 71.301(a), 71.303(a), 74.305 (Vernon 1984 & Supp.1994); TEX.PROB.CODE ANN. § 433(a) (Vernon 1980 & Supp.1994); TEX.WATER CODE ANN. § 29.021 (Vernon 1988); TEX.REV.CIV.STAT. ANN. art. 601b, § 5.15(f) (Vernon Supp.1994).

as should decline jurisdiction in the interest of comity.[6]

Hydrogen's apparent source for this commercial-governmental dichotomy is the law of international sovereign immunity. The doctrine of "restrictive sovereign immunity" is a concept that has developed in United States foreign affairs largely since 1952. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486–88 & nn. 9–10, 103 S.Ct. 1962, 1967–68 & nn. 9–10, 76 L.Ed.2d 81 (1983). The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11 (1988) ("FSIA"), for the most part codifies the doctrine of restrictive sovereign immunity as a matter of federal law. *Id.; Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, —— – ——, 112 S.Ct. 2160, 2165–68, 119 L.Ed.2d 394 (1992). The FSIA does not extend sovereign immunity to "commercial activity" of a foreign nation, as "commercial activity" is defined in the statute. 28 U.S.C. § 1603(d) (1988).

While the FSIA and the cases interpreting it are certainly controlling on the question of whether Texas will recognize the sovereignty of foreign nations, *United Mexican States,* 556 S.W.2d at 785–86, the doctrine of "restrictive sovereign immunity" is not applicable to relations between Texas and its sister states. When KPERS conducts activities in Kansas counties other than Shawnee County, it does not waive the benefit of the mandatory venue statute simply because its activities might be characterized as "commercial" in nature. Nor is the character of KPERS's activity determinative for purposes of interstate comity.

## V

While we have decided that KPERS is entitled to sovereign immunity protection, we must still determine whether K.D.F. and Pacholder may benefit from the sovereign immunity of Kansas. Unlike KPERS, however, K.D.F. and Pacholder are not Kansas governmental entities.

KPERS, K.D.F., and Pacholder point to the Kansas statute, which requires that all lawsuits "directly or indirectly" against KPERS must be brought in Shawnee County. KAN.STAT.ANN. § 74–4904 (1992 & Supp. 1993). Certainly, this language prevents litigants from circumventing the mandatory venue provision by suing KPERS agents or employees in their individual capacities for carrying out instructions of their principal or employer. The same statute further provides "trustees, officers, employees, and agents [of KPERS] shall not be personally liable for acts of the system unless such person acted with willful, wanton or fraudulent misconduct or intentionally tortious conduct." *Id.* However, we decline to interpret the "directly or indirectly" statutory language so broadly that any suit is barred outside Shawnee County if a remote possibility exists that some defendant might sue KPERS for contribution. The appropriate distinction between lawsuits "indirectly" against KPERS and legitimate actions against a KPERS agent or employee in his or her individual capacity is found in the statutory language quoted above—whether the actions complained of are "acts of the system." *Id.*

We find further guidance in the Kansas Tort Claims Act and the Texas Tort Claims Act as they apply to state employees sued as individuals. The Kansas Act waives all immunity subject to express exceptions. KAN. STAT.ANN. §§ 75–6103, 75–6104 (1989 & Supp.1993). Conversely, the Texas Act constitutes a selective waiver, leaving immunity intact except to the extent waived. TEX.CIV. PRAC. & REM.CODE ANN. § 101.025 (Vernon 1986); *see also id.* §§ 101.021, 101.0215, 101.- 023–101.024, 101.051–101.063 (Vernon 1986 & Supp.1994). Both acts provide that the respective state will be liable for acts or omissions of officials or employees in the performance of the duties of office. TEX.CIV.PRAC. & REM.CODE ANN. §§ 104.001–104.003, 108.- 001–108.003 (Vernon Supp.1994); KAN.STAT. ANN. § 75–6109 (1989).

However, indirect liability for the acts of employees is limited in both states. In Texas, a governmental entity's limited liability is

---

**6.** *But see Ehrlich–Bober & Co.,* 404 N.E.2d at 731 ("[A] State entering this jurisdiction specifically to take advantage of its unique commercial re-sources may be considered to have given up any claim of jurisdictional immunity by virtue of governmental capacity.").

derivative of the employee's official immunity. The Texas Tort Claims Act, TEX.CIV.PRAC. & REM.CODE ANN. §§ 101.026, 104.-008 (Vernon 1986), leaves an employee's common law official immunity intact, and chapters 104 and 108 of the Tort Claims Act provide for indemnification of the employee only for "actual damages, court costs, and attorney's fees adjudged against" the employee. TEX.CIV.PRAC. & REM.CODE ANN. §§ 104.001–104.008, 108.001–108.003 (Vernon 1986 & Supp.1994). Official immunity in Texas is an affirmative defense to negligence claims against state employees that applies when employees exercise discretion in good faith while acting within the scope of their official authority. *City of Lancaster v. Chambers,* 1994 WL 264968 (Tex.1994). Thus, Texas is vicariously liable for the acts of its employees only to the extent its employees are not entitled to official immunity.[7] Moreover, section 101.021(1)(B) of the Tort Claims Act provides that Texas itself is liable for an employee's negligent operation of a motor vehicle only if "the employee would be personally liable to the claimant according to Texas law." *Cf.* TEX.CIV.PRAC. & REM.CODE § 101.021(2) (liability for "condition or use of tangible personal or real property" is conditioned upon the *state's* liability "were it a private person").

The Kansas statute collapses the official immunity defenses of the employee and the state into a single statutory exception: "A governmental entity or an employee acting within the scope of ... employment shall not be liable for ... performance or the failure to exercise or perform a discretionary function." KAN.STAT.ANN. § 75–6104(e) (1989 & Supp.1993); *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458 (1982). An "employee" in either state does not include an independent contractor. TEX.CIV.PRAC. & REM. CODE ANN. § 101.001(1) (Vernon 1986); KAN. STAT.ANN. § 75–6102(d) (1989 & Supp.1994).

Thus, in either state, indirect liability on the part of the state will arise from the performance of ministerial functions by a state employee under the control or direction

of the state, and not from (1) discretionary acts of the employee, (2) acts of independent contractors, or (3) intentional, grossly negligent, fraudulent, or malicious conduct by the employee. We think it is reasonable to hold that K.D.F. and Pacholder can benefit "indirectly" from the sovereign immunity of Kansas, subject to these same principles. Therefore, an agent of KPERS will not be subject to Texas jurisdiction in an individual capacity for performing essentially ministerial functions under the control and direction of KPERS.

■ K.D.F. operates solely upon the direction of KPERS, and exercises no discretion in its activities. For jurisdictional purposes, we hold that K.D.F. and KPERS are not distinguishable from one another; a lawsuit against one is a lawsuit against the other.

■ Pacholder, however, is an Ohio corporation that serves as an investment advisor to KPERS. Pacholder operates as an independent contractor. Its activities necessarily involve considerable discretion. Thus, its role is more in the nature of advising KPERS how to proceed, rather than being subject to the direction and control of KPERS.

Pacholder also points out that it has an indemnity agreement with KPERS, and argues that any lawsuit against it is a lawsuit "indirectly" against KPERS. While damages awarded in a lawsuit against Pacholder may ultimately be paid in full by the Kansas government, this fact alone does not require Texas to decline jurisdiction over Pacholder. While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection *ad infinitum* through nothing more than private contracts. Pacholder is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of the Kansas government, executed subject to the control of KPERS. Of course, Texas's jurisdiction over Pacholder also necessarily depends on

---

7. Texas is not required to indemnify its employees for "a willful or wrongful act or an act of gross negligence." TEX.CIV.PRAC. & REM.CODE ANN.

§ 104.002(a)(1) (Vernon Supp.1994); *see also* KAN.STAT.ANN. § 74–4904 (1992 & Supp.1993).

the existence of minimum jurisdictional contacts under the Texas long-arm statute.

For the reasons stated, we conditionally grant the petition for writ of mandamus filed by K.D.F. and KPERS. We deny Pacholder's petition without prejudice so that it may present its special appearance to Judge Rex for reconsideration in light of this opinion. The clerk is directed to issue the writ only in the improbable event that Judge Rex does not vacate his orders overruling the special appearances of KPERS and K.D.F.

DOGGETT, Justice, notes his dissent.