FILED
18-0159
6/12/2020 3:12 PM
tex-43709741
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

No. 17-1010

DAWN NETTLES, PETITIONER,

V.

GTECH CORPORATION, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

*~ consolidated with ~*

No. 18-0159

GTECH CORPORATION, PETITIONER,

V.

JAMES STEELE, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued December 3, 2019**

JUSTICE BUSBY delivered the opinion of the Court, in which JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BLAND joined, in Part III of which CHIEF JUSTICE HECHT, JUSTICE GREEN, and JUSTICE BLACKLOCK joined, and in Parts I and II of which JUSTICE BOYD joined.

CHIEF JUSTICE HECHT filed an opinion concurring in part and dissenting in part in which JUSTICE GREEN and JUSTICE BLACKLOCK joined.

JUSTICE BOYD filed an opinion concurring in part and dissenting in part.

JUSTICE GUZMAN did not participate in the decision.

In this case, we consider whether derivative sovereign immunity bars claims against GTECH Corporation, a private contractor. GTECH provided instant ticket manufacturing and services to the Texas Lottery Commission. Several plaintiffs filed two separate suits against GTECH, alleging that the instructions on a scratch-off lottery ticket were misleading, causing them to believe they had winning tickets when they did not. GTECH filed pleas to the jurisdiction, asserting it was entitled to the same immunity held by the Lottery Commission. One of the trial courts granted GTECH's plea to the jurisdiction, but the other court denied the plea. On appeal, the Dallas Court of Appeals affirmed the trial court's grant of the plea to the jurisdiction. The Austin Court of Appeals affirmed in part and reversed in part the trial court's denial of the plea.

As to the plaintiffs' fraud claims, we hold that GTECH would not qualify for derivative sovereign immunity even if we recognized that doctrine because the Lottery Commission did not control GTECH's choices in writing the game instructions. We affirm the Austin Court of Appeals' judgment holding that GTECH is not entitled to immunity from the plaintiffs' fraud claims, and we reverse the portion of the Dallas Court of Appeals' judgment holding otherwise. GTECH is entitled to immunity, however, from the plaintiffs' allegations of aiding and abetting the Commission's fraud and of conspiracy with the Commission. Because the plaintiffs necessarily must override the substance of the Commission's underlying decisions in order to impose derivative liability on GTECH, these allegations implicate the purposes of sovereign

2

immunity. We therefore affirm the Dallas Court of Appeals' judgment in part as to these allegations.

## BACKGROUND

The Lottery Commission contracted with GTECH for instant ticket manufacturing and services. In performing its obligations under the contract, GTECH proposed the FUN 5's scratch-off game, which it had operated in other states. The Commission selected the game, and GTECH submitted working papers with images of the ticket, detailed specifications, and game parameters. In the working papers, the scratch-off ticket included five different games, including a tic-tac-toe game. A player would win the tic-tac-toe game if a ticket had three dollar-bill symbols in a single row, column, or diagonal line and would win the amount in a "PRIZE" box. The game also included a 5X multiplier box, which allowed a player to win five times the PRIZE amount if the box contained a 5 symbol. The working papers specified that a 5 symbol would only appear in the 5X box on eligible winning tickets. The proposed instructions for the tic-tac-toe game provided: "Reveal three Dollar Bill '[dollar bill icon]' symbols in any one row, column, or diagonal line, win PRIZE in PRIZE box. Reveal a '5' symbol in the 5X BOX, win 5 times that PRIZE."

The Lottery Commission responded to GTECH's working papers with changes to the game. For the tic-tac-toe game, the Commission requested that the dollar-bill icon be changed to a 5 symbol and that the multiplier 5 symbol in the 5X box be changed to a money-bag symbol. The Commission also notified GTECH that the money-bag symbol needed to appear on some non-winning as well as winning tickets in order to prevent microscratching—using a small, sharp object to reveal a microscopic portion of a ticket to determine whether it is a winner.

3

GTECH implemented the requested changes. Although GTECH had designed the multiplier symbol for use only on tickets containing a winning tic-tac-toe game, the symbol also appeared on some non-winning tickets as the Commission had instructed. GTECH did not change the instructions on the tickets for the tic-tac-toe game other than to reflect the new symbols. The final instructions read: "Reveal three '5' symbols in any one row, column, or diagonal, win PRIZE in PRIZE box. Reveal a Money Bag '[money bag icon]' symbol in the 5X BOX, win 5 times that PRIZE."

The Lottery Commission began selling the Fun 5's scratch-off game on September 2, 2014. Lottery players began calling the Lottery Commission about the game immediately, saying that they thought the money-bag symbol on their tickets meant an automatic win of five times the amount in the prize box. Callers complained that the game instructions were misleading, leading them to believe incorrectly that they had winning tickets even though they had not also won the tic-tac-toe game. Legislators also contacted the Lottery Commission regarding constituent complaints that the instructions were misleading. Based on these complaints, the Lottery Commission shut down the game on October 21.

Several people who had purchased non-winning Fun 5's tickets that included a money-bag symbol sued GTECH, claiming it misled them into believing they would win if their tickets revealed a money-bag symbol. James Steele and more than 1,200 other named plaintiffs (collectively, Steele) filed one suit against GTECH in Travis County. These plaintiffs brought claims for fraud, fraud by nondisclosure, aiding and abetting the Lottery Commission's fraud, tortious interference with the plaintiffs' contracts with the Texas Lottery, and conspiracy with the

4

Lottery Commission. Dawn Nettles filed suit against GTECH in Dallas County.[1] She similarly asserted claims for common-law fraud, fraud by nondisclosure, aiding and abetting the Lottery Commission's fraud, and conspiracy with the Lottery Commission.

GTECH filed pleas to the jurisdiction in both counties. GTECH asserted that derivative sovereign immunity barred all the claims against it because the suits were premised on alleged conduct directed and controlled by the Lottery Commission, an entity with sovereign immunity. The Dallas County trial court granted GTECH's plea to the jurisdiction and dismissed the case, but the Travis County trial court denied GTECH's plea.

Nettles appealed the dismissal of her suit to the Dallas Court of Appeals. The Dallas Court affirmed, concluding that Nettles's claims were barred by immunity because GTECH met its burden of proving it acted as the Lottery Commission and did not exercise independent discretion in making the changes to the lottery tickets that were the basis of Nettles's claims. 581 S.W.3d 234, 244 (Tex. App.—Dallas 2017).

GTECH appealed the denial of its plea in the Steele case to the Austin Court of Appeals. The Austin Court affirmed in part and reversed and rendered in part. As for Steele's claims of aiding and abetting fraud, tortious interference, and conspiracy, the court held they implicated sovereign immunity because the complaints substantively challenged underlying Lottery Commission decisions and directives. 549 S.W.3d 768, 796 (Tex. App.—Austin 2018). But the court held the plea had been properly denied as to the fraud claims, which related to actions taken by GTECH within its independent discretion. *Id.* at 802–03. The court explained that if

---

[1] Nettles also sued the Lottery Commission. The trial court granted the Lottery Commission's plea to the jurisdiction, and that order is not at issue in this appeal.

"the relevant contracts would leave the government contractor discretion to comply with the asserted tort duty and avoid the conduct alleged to be wrongful," as the contract did here, "there is no derivative immunity." *Id.* at 803.

Both GTECH and Nettles filed petitions for review in this Court, which we granted. The parties disagree regarding what GTECH must prove to be entitled to the Commission's immunity and whether it met that legal standard as to each of the claims against it.

## ANALYSIS

### I. Standard of review

Sovereign immunity is the "well-established doctrine 'that no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.'" *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006)). Sovereign immunity is a common-law doctrine. *Id.* at 122. It is the responsibility of the judiciary to decide when our State and its political subdivisions have immunity and to define its boundaries, and the responsibility of the Legislature to determine whether to waive immunity and to what extent. *Id.*

Immunity from suit implicates a court's subject-matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Hous. Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016). Because subject-matter jurisdiction is a question of law, we review de novo a trial court's ruling on a plea to the jurisdiction. *See Brown & Gay*, 461 S.W.3d at 120.

6

**II.    GTECH is not entitled to derivative immunity from suit on the plaintiffs' fraud claims.**

    **A.    The standard for derivative immunity discussed in *Brown & Gay* considers contractor discretion and government control.**

We have not had many opportunities to address whether a Texas government agency's immunity from suit might extend to its private contractors, and if so under what circumstances. *See Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 751 (Tex. 2019). Federal courts, and some Texas courts of appeals, have held that "government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the [government]." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). "[U]nlike the sovereign's," however, that immunity "is not absolute." *Id.*

We most recently addressed the subject of derivative immunity for private contractors in *Brown & Gay*. In that case, Brown & Gay Engineering contracted with the Fort Bend County Toll Road Authority, a governmental entity, to build a roadway. 461 S.W.3d at 119. Brown & Gay was sued after a fatal accident on the roadway and asserted that as a contractor, it was entitled to the same governmental immunity as the Authority. *Id.* at 120. We concluded Brown & Gay was not entitled to share the Authority's immunity. *Id.* at 127.

In addressing whether to extend immunity to the private contractor, we concluded that doing so would not further the rationale or purpose of the immunity doctrine and also considered cases where the "complained-of conduct for which the contractor was immune was effectively attributed to the government." *Id.* at 123-25. In *K.D.F. v. Rex*, for example, we explained that under Kansas law a private company operating "solely upon the direction" of a state government

7

entity, and exercising "no discretion in its activities," was "not distinguishable" from the entity such that "a lawsuit against one [was] a lawsuit against the other." 878 S.W.2d 589, 597 (Tex. 1994). And in *Butters v. Vance International, Inc.*, 225 F.3d 462, 464 (4th Cir. 2000), the court held that a security firm was immune from suit where it was following orders from the federal government. *Brown & Gay* explained that in cases where a contractor shared in immunity, the conduct complained of was "effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor." *Brown & Gay*, 461 S.W.3d at 125.

In contrast, the plaintiffs alleged Brown & Gay was independently negligent in designing the road signs and traffic layouts. *Id.* at 126. Even though Brown & Gay's design plans were subject to approval by the Authority, Brown & Gay was responsible under the contract for preparing the specifications for all signs. *Id*. at 126; *see also id.* at 131 (Hecht, C.J., concurring) (pointing out that Authority "supervised the firm's work" but "did not tell Brown & Gay *how* to do the work"). The suit against Brown & Gay did not complain of the existence of the project or seek to hold it liable for implementing the Authority's specific directions, so we concluded Brown & Gay was responsible for its own negligence. *Id.* at 127.

We quoted a federal court as "aptly summariz[ing] the framework governing the extension of derivative immunity to federal contractors." *Id.* at 125 n.9 (quoting *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1242 (D. Or. 2010)). That framework includes three scenarios involving a government contractor's derivative immunity: (1) a contractor is entitled to the same immunity as the government when the government specifies the manner in which a task is to be performed, the contractor complies, and the contractor is sued for a harm caused by its

8

compliance with specifications; (2) a contractor is not entitled to derivative immunity when the contractor is allowed to exercise discretion in how to perform a task and the manner of performing the task ultimately causes harm; and (3) a contractor is not entitled to immunity when it is hired to perform a task according to precise specifications but fails to comply with the specifications. *Id.*

In sum, as we explained in *Brown & Gay*, the primary considerations some courts have used in deciding whether to extend sovereign immunity to private contractors are the government's control and the contractor's discretion. *Id.* at 124–26; *see also id.* at 130–31 (Hecht, C.J., concurring). In determining how those considerations come into play, courts that have considered the possibility of contractor immunity have looked to the pleadings: does the suit complain of a governmental decision the contractor was implementing, or of the manner in which the contractor performed a contractual obligation? *Id.* at 130 & nn.5–6 (Hecht, C.J., concurring). Put simply, these courts ask (1) did the government tell the contractor what to do and how to do it (as opposed to the contractor having "some discretion in performing the contract"[2]); and, if so, (2) did the contractor do as it was told? When the answer to both questions is yes, these courts extend a form of immunity to the contractor's conduct.[3]

---

[2] *Brown & Gay*, 461 S.W.3d at 130 n.6 (Hecht, C.J., concurring) (quoting *Allen Keller Co. v. Foreman*, 343 S.W.3d 420, 425–26 (Tex. 2011)).

[3] We note this control-based standard is similar to the test for distinguishing between independent contractors and employees. *See Limestone Prods. Distribution, Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) ("The test to determine whether a worker is an employee rather than an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the work."). Government employees sued in their official capacity are entitled to assert the government's own immunity from suit (unless they act *ultra vires*), and employees sued in their individual capacity are protected by official immunity. *See Hous. Belt & Terminal Ry.*, 487 S.W.3d at 164 & n.7; *Brown & Gay*, 461 S.W.3d at 126 (discussing *Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P.*, 333 S.W.3d 736 (Tex. App.—Houston [1st Dist.] 2010, no pet.)); *Steele*, 549

Ultimately, we did not decide whether derivative sovereign immunity could ever apply to a government contractor and did not adopt this or any other immunity standard in *Brown & Gay* because it was unnecessary to do so. *Id.* at 126. Having concluded that the Authority exercised "no control" over the contractor's complained-of conduct, we observed that "[w]e need not establish today whether some degree of control by the government would extend its immunity protection to a private party." *Id.*

Here, the parties have not briefed the questions whether we should recognize a doctrine of derivative sovereign immunity for contractors, or if so, what standard we should adopt for determining the scope of that immunity. As in *Brown & Gay*, we need not decide those questions today.[4] The parties focus their arguments instead on the control-based standard used by the courts whose decisions we discussed in *Brown & Gay*. For the reasons explained below, we hold GTECH would not be entitled to immunity under that standard.

### B. Because GTECH exercised discretion in choosing the game instructions, it would not be entitled to derivative immunity from fraud claims based on those instructions.

We first apply the control-based immunity standard to the claims of fraud by misrepresentation and non-disclosure brought by Steele and Nettles. GTECH contends that the Lottery Commission's exercise of statutory and contractual control over the form of the Fun 5's ticket entitles GTECH to share in the Commission's immunity. Nettles and Steele assert that GTECH is not entitled to immunity because it exercised at least some discretion in creating and producing the Fun 5's game. If we recognized derivative sovereign immunity under the control

---

S.W.3d at 783–84. In this case, however, GTECH's contracts with the Commission specify that it is an independent contractor, and GTECH has not argued it should nevertheless be considered an employee for immunity purposes.

[4] We therefore express no view in this case on the arguments presented by JUSTICE BOYD.

standard discussed above, we would have to determine whether the Lottery Commission had sufficient control over GTECH's actions that they were effectively attributable to the Commission and were not GTECH's independent actions, or whether GTECH had some discretion.

Before we can make this determination under the control standard, we must first define precisely what conduct of GTECH is at issue. GTECH had multiple responsibilities under its contract with the Commission, including submitting working papers to the Commission and manufacturing game tickets, and the parties disagree about which conduct is at issue here. In *Brown & Gay*, we referred to the "complained-of conduct" in discussing cases in which a contractor shared the government's immunity. 461 S.W.3d at 125. We noted Brown & Gay was sued for failure to design and install proper signs and other traffic-control devices, and we ultimately determined it could not be entitled to immunity under the control standard because it had discretion over these designs. *Id.* at 120, 126. Following this approach, we would look first to the "complained-of conduct" in the pleadings to determine whether a party could be entitled to derivative immunity. *See id.* at 125; *see also Orion Real Estate v. Sarro*, 559 S.W.3d 599, 607 (Tex. App.—San Antonio 2018, no pet.) (looking to negligence claim to determine the "complained-of conduct").

According to Nettles's and Steele's fraud allegations, the tickets contained a representation that a player would win if the ticket included a money-bag symbol, but this was a false representation because not all tickets with a money-bag symbol were winning tickets.[5] Nettles alleged that GTECH "crafted" the representation on the Fun 5's tickets. Similarly, Steele

---

[5] We express no view regarding the merit of these fraud allegations, as that issue is not before us.

alleged that GTECH "chose the wording" of the representation on the Fun 5's tickets. Both plaintiffs asserted that the wording chosen by GTECH was misleading given the change in game parameters. They also asserted that GTECH failed to disclose to plaintiffs that not all tickets with a money-bag symbol were winning tickets.

GTECH counters that the conduct at issue is GTECH "accepting and implementing the Commission's directions," but we disagree with this characterization of the claims. Plaintiffs are challenging GTECH's actions in choosing the wording of the instructions initially as well as in maintaining that wording even after the change in game parameters. We therefore examine the extent to which GTECH had discretion and the Commission had control with regard to this conduct.

In this examination, we are "not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Here, the evidence necessary to resolve this jurisdictional issue includes the parties' contract as well as evidence regarding the course of performance. *See Bay, Inc. v. Ramos*, 139 S.W.3d 322, 327 (Tex. App.—San Antonio 2004, pet. denied) (considering contract as well as testimony regarding contractor's responsibilities when considering whether contractor had immunity); *see also Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 607–08 (Tex. 2002) (considering evidence of performance when analyzing whether premises owner actually exercised control over contractor's work). We review the evidence under a standard mirroring that of summary judgment, taking as true all evidence favoring the plaintiff and indulging reasonable inferences and resolving doubts in the plaintiff's favor. *See Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016).

The contract for instant ticketing manufacturing and services, and the Lottery Commission's request for proposals incorporated into the contract, required GTECH to provide suggested game designs. After receiving approval from the Lottery Commission, GTECH was to provide draft working papers with specifications of the game, the Commission was to request any changes, and then GTECH was to provide final working papers. The contract provided that "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the Texas Lottery in its sole discretion" and that the tickets would "conform to, and function in accordance with, Texas Lottery-approved specifications and designs."

The contract also provided that GTECH's game development team was required to demonstrate knowledge and experience with game design elements, graphic design, and product management. The GTECH customer service representative who prepared the Fun 5's working papers testified that after the Lottery Commission made any comments or notes regarding working papers, she would "take a look at the change and then decide from there" about making the change. She testified that it is the job of GTECH's customer service representative to review the instructions after the Commission has asked for a change in parameters to make sure the instructions are clear and unambiguous, and do not need to be changed. The GTECH account development manager testified he would expect that if GTECH employees saw a change from the Commission that would harm the game, they would attempt to let someone know to address it with the Commission. The Commission's instant product coordinator testified he would expect GTECH to notify the Commission if it saw concerns with a game, including misleading instructions.

After the Commission approved the suggested game design for the Fun 5's tickets, GTECH internally reviewed the artwork, instructions, and parameters for the game and submitted working papers to the Commission. As previously explained, the working papers featured a tic-tac-toe game that included a 5X multiplier box, which allowed a player to win five times the PRIZE amount if the box contained a 5 symbol. The working papers specified that a multiplier 5 symbol would appear only on tickets with winning tic-tac-toe games. The Commission asked for changes to the tic-tac-toe game, including changing the winning symbol in the 5X multiplier box from a 5 to a money-bag symbol and including the multiplier money-bag symbol on some non-winning tickets. According to GTECH's regional sales director, after the Commission requested that the multiplier symbol also appear on non-winning tickets, it would be the responsibility of GTECH's customer service representative to look at the language of the instructions and determine whether they needed to be changed. There is also evidence that GTECH's customer service representative actually reviewed the instructions and decided they did not need to be changed.

Based on the contract and other evidence, we agree with Nettles and Steele that GTECH had some discretion with regard to the conduct at issue. In *K.D.F.*, we held that an independent contractor investment advisor to KPERS—a Kansas governmental entity—could not benefit from the sovereign immunity of Kansas. 878 S.W.2d at 597. We recognized that the contractor's "role [was] more in the nature of advising KPERS how to proceed, rather than being subject to the direction and control of KPERS." *Id.* The contractor's "activities necessarily involve[d] considerable discretion." *Id.*

14

Similarly here, GTECH's role with regard to the conduct at issue—"crafting" or "choosing the wording" of the representation on the Fun 5's tickets before and after the change in parameters—was in the nature of advising the Commission how to proceed. The contract not only gave GTECH discretion, it required GTECH to provide recommendations for all parts of the game. The contract also specified that the Commission "may rely upon the guidance of [GTECH] in all matters related to instant game development and manufacturing services." In providing this guidance, GTECH was not "simply implementing the [Commission's] decisions" such that its conduct could be "effectively attributed to the government." *Brown & Gay*, 461 S.W.3d at 126; *accord id.* at 130 (Hecht, C.J., concurring). As we noted in *K.D.F.*, there is a distinction between a contractor that advises a governmental entity how to proceed and one that "operates solely upon the direction of" that entity. 878 S.W.2d at 597.

GTECH stresses that the Commission possessed and exercised total control over all aspects of the Fun 5's tickets through the contract and the State Lottery Act. The contract provided that "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the Texas Lottery in its sole discretion." The Lottery Act provides that the Commission "shall exercise strict control and close supervision over all lottery games." TEX. GOV'T CODE § 466.014(a).[6]

But close supervision and final approval of work over which a contractor has discretion are not the same as the government specifying the manner in which a task is to be performed. *See Brown & Gay*, 461 S.W.3d at 125 n.9 (quoting *Bixby*, 748 F. Supp. 2d at 1242). In *Brown &*

---

[6] The Lottery Act also authorizes the Commission's executive director to "contract with or employ a person to perform a function, activity, or service in connection with the operation of the lottery," which is what occurred here. *Id.* § 466.014(c).

15

*Gay*, for example, the Fort Bend County Toll Road Authority delegated responsibility to Brown & Gay to design road signs and traffic layouts "subject to approval by the Authority's Board of Directors." *Id.* at 119. We nevertheless concluded that the entity had "no control" over Brown & Gay's work. *Id.* at 126.[7] And in *Lenoir v. U.T. Physicians*, U.T. Physicians operated a medical clinic under contract with a governmental entity. 491 S.W.3d 68, 77 (Tex. App.— Houston [1st Dist.] 2016, pet. denied). The contract provided that U.T. Physicians would provide all nursing personnel, but the entity had the right to approve all personnel and to require removal of any personnel in certain circumstances. *Id.* at 86. Relying on *Brown & Gay*, the court of appeals held U.T. Physicians was not entitled to immunity in a suit for a nurse's negligence because it was granted contractual discretion to provide nursing and clinical personnel, even though the governmental entity had the right to approve and remove personnel. *Id.*

In *Brown & Gay*, we quoted a case explaining that federal contractors are entitled to the same immunity as the government when "the government hires a contractor to perform a given task, and specifies the manner in which the task is to be performed, and the contractor is later hauled into court to answer for a harm that was caused by the contractor's compliance with the government's specifications." 461 S.W.3d at 125 n.9 (quoting *Bixby*, 748 F. Supp. 2d at 1242). But where a contractor has been granted discretion to perform a task and the government

---

[7] CHIEF JUSTICE HECHT disputes the relevance of this conclusion, asserting that the complaint in *Brown & Gay* "was about the engineer's design," while "[t]he plaintiffs' complaint here is about the Commission's game." *Post* at ___. But as discussed above, the plaintiffs' petitions show their complaint is about the instructions furnished by GTECH for the Commission's game, just as the complaint in *Brown & Gay* was about the design furnished by the engineer for the Authority's road.

approves those discretionary plans, the government has not specified the manner in which the task is to be performed. *See id.* at 127.

In this case, GTECH was contractually obligated to design the tickets, and it submitted working papers to the Commission that included game specifications and instructions. The Commission did not tell GTECH how to write the instructions. The Commission did instruct GTECH to include the multiplier money-bag symbol on some non-winning tickets, and GTECH changed the final working papers accordingly. The Commission then approved those final working papers. Both before and after making the changes requested by the Commission, GTECH had discretion regarding the conduct at issue: choosing the wording of the game instructions. The Commission did not specify the manner in which that task was to be performed; it only approved GTECH's proposed instructions. GTECH points to nothing in the contract, the statute, or the evidence that left GTECH without discretion to propose complete and non-misleading instructions.[8] Thus, even if we recognized derivative sovereign immunity for contractors, GTECH would not be entitled to immunity from suit on the fraud claims under the control standard.

### C.   GTECH's remaining arguments regarding the fraud claims cannot be resolved on a plea to the jurisdiction.

GTECH also asserts that any representation on the Fun 5's tickets was made by the Commission and that any failure of GTECH to suggest to the Commission that it should consider changing the tickets' content is not a misrepresentation to plaintiffs that could form the basis of any alleged fraud. Similarly, CHIEF JUSTICE HECHT contends that plaintiffs cannot complain of

---

[8] *See Steele*, 549 S.W.3d at 802–03 (considering whether "government contractor's contract would leave it no discretion to comply with an asserted tort duty").

17

GTECH's faulty counsel to the Commission. *Post* at ___. But whether GTECH's conduct does or does not constitute fraud, or whether any fraud was solely the result of the Commission's representations, are merits issues separate from whether GTECH could have derivative immunity.

The only issue in this appeal is whether the trial courts lacked jurisdiction based on GTECH's claim to be protected by derivative immunity. *See Hous. Belt & Terminal Ry.*, 487 S.W.3d at 160 (recognizing immunity from suit implicates a court's subject-matter jurisdiction so it is properly asserted in a plea to the jurisdiction). A challenge to an element of a plaintiff's claim by a defendant who lacks immunity from suit does not implicate the jurisdiction of the court; it should be raised in a motion for summary judgment rather than a plea to the jurisdiction. *See Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010) ("A defendant who conclusively negates at least one of the essential elements of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment."); *Werth v. Johnson*, 294 S.W.3d 908, 909 (Tex. App.—Beaumont 2009, no pet.) (defendant in fraud claim filed motion for summary judgment claiming there was no evidence she made any false representations).

### D. Extending immunity from the fraud claims to GTECH would not further the purposes of immunity.

GTECH asserts as an additional ground that extending derivative immunity to it would serve the pecuniary justification for sovereign immunity. In *Brown & Gay*, we discussed whether extending sovereign immunity to the private contractor would "comport[] with and further[] the legitimate purposes that justify this otherwise harsh doctrine" and concluded it would not. 461 S.W.3d at 123. We explained that sovereign immunity was "designed to guard against the 'unforeseen expenditures' associated with the government's defending lawsuits and

paying judgments 'that could hamper government functions' by diverting funds from their allocated purposes." *Id.* (quoting *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011)). We concluded that immunizing the private contractor would not further this rationale because even if holding a contractor liable for its own actions in performing a government contract would lead to higher overall governmental costs, those costs would be reflected in a negotiated contract price. *Id.*

In addition to the pecuniary justification of protecting the public fisc discussed in *Brown & Gay*, considerations of government structure underlie the immunity doctrine. *Rosenberg Dev. Corp.*, 571 S.W.3d at 750. "[T]he immunity doctrine respects the separateness of the branches of government," *id.* at 751, and immunity seeks to maintain that separateness by preventing the judiciary from interfering with the responsibilities of other branches. *See Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019) (citing *Brown & Gay*, 461 S.W.3d at 121).[9]

GTECH contends these justifications for immunity are implicated here because these suits attack the Commission's decisions about the form and content of the Fun 5's game, seeking to control the State's choices about the use of public funds. But as discussed above, plaintiffs' fraud claims complain of GTECH's choices in writing the alleged misrepresentation, not of any decision by the Commission. As for GTECH's argument that the Commission itself made the representation on the tickets (an issue we do not decide as discussed above), GTECH is free to present this ground in a motion for summary judgment or argue it at trial. Allowing courts to entertain the claims would not force the Commission to make unexpected financial expenditures

---

[9] Another justification for immunity is pragmatic: to benefit the public by preventing disruptions of key government services. *Rosenberg Dev. Corp.*, 571 S.W.3d at 750. GTECH does not claim that any key government services are at issue here.

or interfere with its responsibilities. We therefore conclude that granting GTECH derivative sovereign immunity from suit on these claims would not further the purposes of immunity.

### III. GTECH is entitled to immunity from Nettles's allegations of conspiracy and of aiding and abetting.

Also before us in Nettles's case are allegations that GTECH conspired with the Commission, and aided and abetted an alleged fraud by the Commission.[10] Aiding and abetting and conspiracy are theories of derivative or vicarious liability. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 85–86 (Tex. 2015). These liability-spreading theories depend upon liability for an underlying tort, and they survive or fail alongside that tort. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 148 (Tex. 1999)). For example, in *Chu v. Hong*, we found no basis for holding an alleged co-conspirator liable where the underlying torts did "not exist." 249 S.W.3d 441, 444 (Tex. 2008).

We also addressed the viability of conspiracy and aiding-and-abetting theories in *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573, 583 (Tex. 2001). We held that the trial court properly granted summary judgment on a fraud claim because the defendant negated an element of the claim. *Id.* at 582–83. We then considered whether the trial court also properly granted summary judgment on conspiracy and aiding-and-abetting theories that were premised on the alleged fraud. *Id.* at 583. We held that failure of the underlying claim "necessarily dispose[d]" of these theories. *Id.*

---

[10] Steele also alleged that GTECH conspired with the Commission, and aided and abetted the Commission's fraud. The court of appeals dismissed these theories for want of jurisdiction, *see* 549 S.W.3d at 804, and Steele does not challenge that holding in this Court.

20

In this case, Nettles's theories of conspiracy and of aiding and abetting against GTECH are wholly derivative of an alleged underlying fraud by the Commission alone.[11] Unlike the fraud claims against GTECH analyzed above, these alternative theories assume that the Commission is responsible for the game instructions and committed fraud through those instructions; they focus on GTECH's subsequent actions of printing the allegedly misleading and deceptive instructions and distributing the tickets with those instructions.

The record shows that the Commission specified the manner in which GTECH was to print and distribute the tickets. Once the Commission authorized the Fun 5's working papers, GTECH was to manufacture the game according to detailed specifications. Any changes after the Commission approved the final working papers required written authorization from the Commission's executive director. Distribution was also strictly directed by the Commission, including packaging, delivery vehicles, and delivery location. The parties' contract obligated GTECH to "accept and support" the Commission's decisions and to conform its "tickets, games, goods, and services" to the Commission's specifications.

Taken together, the pleadings and record show that Nettles can prevail on her conspiracy and aiding-and-abetting theories against GTECH only by proving that the Commission's actions within its delegated powers were fraudulent. *See Agar Corp.*, 580 S.W.3d at 140; *Ernst & Young*, 51 S.W.3d at 583. Nettles's allegations of derivative liability for the Commission's decisions therefore implicate the purposes of sovereign immunity recognized in our cases. As

---

[11] We note this will not be true of all aiding-and-abetting or conspiracy theories involving government as well as non-government actors. For example, the underlying tort could be committed by government as well as non-government actors, or committed by non-government actors whom a government actor aided (or with whom the government actor conspired). We express no view on whether sovereign immunity will extend to non-government actors based on allegations of conspiracy or of aiding and abetting other than those before us.

discussed above, immunity preserves the separation of powers by preventing the judiciary from interfering with the policymaking responsibilities of other branches of government and seeking to control their choices regarding the use of public funds. *Hughes*, 573 S.W.3d at 218; *Rosenberg Dev. Corp.*, 571 S.W.3d at 750; *Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 706 (Tex. 2003). Because Nettles necessarily must override the substance of the Commission's underlying decisions in order to impose derivative liability on GTECH, we hold GTECH is entitled to immunity from the theories of conspiracy and of aiding and abetting alleged here.

## CONCLUSION

GTECH is not entitled to derivative immunity from Steele's or Nettles's fraud claims. GTECH is entitled to immunity, however, from Nettles's allegations of conspiring with the Commission, and aiding and abetting an alleged fraud by the Commission. We therefore affirm the judgment of the Austin Court of Appeals and reverse the judgment of the Dallas Court of Appeals as to the fraud claims, affirm the judgment of the Dallas Court of Appeals as to the allegations of conspiracy and of aiding and abetting, and remand the fraud claims to the trial courts for further proceedings.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** June 12, 2020

22

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43709741
Status as of 06/12/2020 15:17:06 PM -05:00

Associated Case Party: GTECH Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Bernick | 24078227 | mbernick@reedsmith.com | 6/12/2020 3:12:47 PM | SENT |
| Arturo Munoz | | amunoz@reedsmith.com | 6/12/2020 3:12:47 PM | SENT |

Case Contacts

| Name |
|------|
| Nina Cortell |
| Denise Stilz |
| Michelle Meuhlen |
| Kent Rutter |
| Jason NealJordan |
| Janet Neal |
| Richard LaGarde |
| Kenneth E. Broughton |
| William Webb |
| Daniel H. Byrne |
| Manfred Sternberg |
| Andrew George Khoury |
| Leonard Cox |
| Blake Charles Erskine |
| Paul Morin |
| Christopher Scott Hamilton |
| John Read |
| Leroy Scott |
| Olegario Garcia |
| Henderson L. Buford |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below:

Envelope ID: 43709741
Status as of 06/12/2020 15:17:06 PM -05:00

Case Contacts

| William Martin Pratt | 24005118 | lawofficeoffice@yahoo.com | 6/12/2020 3:12:47 PM | SENT |
|---|---|---|---|---|
| Richard W. Mithoff | 14228500 | rmithoff@mithofflaw.com | 6/12/2020 3:12:47 PM | SENT |
| Joseph Wesley Dauphinot | 793584 | wes@dauphinotlawfirm.com | 6/12/2020 3:12:47 PM | SENT |
| Kevin Philip Parker | 15494020 | kpp@lanierlawfirm.com | 6/12/2020 3:12:47 PM | SENT |
| Christopher Lee Gadoury | 24034448 | chris.gadoury@lanierlawfirm.com | 6/12/2020 3:12:47 PM | SENT |
| Eugene W. Brees | 2947500 | cbrees@nationaltriallaw.com | 6/12/2020 3:12:47 PM | SENT |
| James Dean Hurst | 10315250 | jdhurst@sbcglobal.net | 6/12/2020 3:12:47 PM | SENT |
| W. Mark Lanier | 11934600 | jrm@lanierlawfirm.com | 6/12/2020 3:12:47 PM | SENT |
| Jason LaFond | | jason.lafond@oag.texas.gov | 6/12/2020 3:12:47 PM | SENT |
| clerk clerk | | clerk@hamiltonwingo.com | 6/12/2020 3:12:47 PM | SENT |
| Mike Hatchell | | mike.hatchell@haynesboone.com | 6/12/2020 3:12:47 PM | SENT |
| Chris Knight | | chris.knight@haynesboone.com | 6/12/2020 3:12:47 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 6/12/2020 3:12:47 PM | SENT |
| John T.McDowell | | jtm@houstontrialattorneys.com | 6/12/2020 3:12:47 PM | SENT |
| Jerry B.Register | | registerjb@outlook.com | 6/12/2020 3:12:47 PM | SENT |
| Andrea L.Fitzgerald | | afitzgerald@hamiltonwingo.com | 6/12/2020 3:12:47 PM | SENT |
| Kacy JoyShindler | | ks@houstontrialattorneys.com | 6/12/2020 3:12:47 PM | SENT |
| Arturo Munoz Holguin | | amunoz@reedsmith.com | 6/12/2020 3:12:47 PM | SENT |